**George CITRONER, Plaintiff,**

v.

**PROGRESSIVE CASUALTY INSURANCE CO.,**
**Defendant.**

**No. 99 CV 5532 NG.**

United States District Court,
E.D. New York.

June 5, 2002.

Louis Ginsberg, New York City, for plaintiff.

Alfred G Feliv, New York City, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

George Citroner brings this action against Progressive Casualty Insurance Co. ("Progressive") alleging harassment and discriminatory termination on the basis of race, ethnicity, and national origin, and retaliatory termination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000(e) *et seq.;* 42 U.S.C. § 1981; the New York State Human Rights Law ("NYSHRL"), New York State Executive Law §§ 290 *et seq.;* and the Administrative Code of the City of New York ("NYCHRL") § 8–107. Defendant moves for summary judgment pursuant to Fed.R.Civ.P. 56 on all of plaintiff's claims.

### FACTS

Unless otherwise indicated, the following facts are undisputed.

Defendant is a casualty insurer specializing in personal automobile insurance and is headquartered in Ohio. Plaintiff identifies his race as Hispanic–American; his national origin as Argentinian and Puerto Rican; his ethnicity as white, black, and Asian; and his skin color as tan. Richard Dowd, the office manager for the Brooklyn office of Progressive, interviewed plaintiff, and plaintiff was hired for the position of claims adjustor/claims representative commencing on September 15, 1997. He was assigned to a team leader, Chandal Brown, who in turn reported to Dowd. Plaintiff was assigned to the Day 1 Unit, where his primary responsibility was speaking to insured individuals after an automobile accident. After a period of time, plaintiff also performed damage appraisal work, which required him to visit accident sites, autobody shops, and the homes of insureds.

Plaintiff attended a mandatory Progressive training class in Tampa, Florida from

September 29, 1997 to October 10, 1997. Plaintiff attended a second training class in Ohio from November 3, 1997 to November 21, 1997. Upon his return, a new team leader, John Noto, was assigned to plaintiff's team on November 24, 1997. As team leader, Noto had no authority to hire or fire employees and was required to review all matters of performance management with his manager. Schmitt Aff. ¶ 9.[1]

*1. Alleged harassment by Noto and Dowd of plaintiff and plaintiff's alleged harassment of a co-employee:*

According to the Complaint and plaintiff's EEOC Charge, on December 11, 1997, Noto began to engage in racial harassment after overhearing plaintiff speaking Spanish with a client. According to plaintiff, Noto pulled him aside and told him he must act more "white." Plaintiff also claims that Noto told him he had to "lose that cocky Spanish attitude." Complaint ¶ 9, Feliu Ex. 1; EEOC Charge ¶¶ 7–8, Feliu Ex. 2. According to the EEOC Charge and Complaint, "[f]rom that point on, Mr. Noto harassed plaintiff due to plaintiff's Hispanic national origin, race, and ethnicity" by giving plaintiff more work in an effort to force plaintiff from his job, yelling at plaintiff, and calling plaintiff "Speedy Gonzalez." Complaint ¶ 10; EEOC Charge ¶ 9.

However, at his deposition, plaintiff testified that "it was after December 11th that his harassment became much more aggressive, much more vocal. It involved other employees. Before that it was just between him and myself the comments would be made, although they would be in front of other people. He wouldn't include anyone else." Citroner Depo. 111–12. At one point in his deposition testimony, plaintiff claims that December 11th was the first and only time Noto told him to act more white and loose the cocky Spanish attitude, but at another point he claims that Noto told him to act more white and remove an Argentine flag from his desk on other occasions. Plaintiff testified that, prior to December 11, 1997, Noto "would just make Spanish noises. Say, 'Hey, Speedy Gonzalez,' very low level, very random." *Id.* at 109. Plaintiff claims that one day, Noto left a Speedy Gonzalez doll, and, on another occasion, Noto "passed gas in my face and made a comment about beans and Hispanics." *Id.* at 74, 79–80. Plaintiff complained to Noto about his behavior, but to no avail.

Further, plaintiff testified at his deposition that Noto's harassment predated his appointment as plaintiff's team leader. Noto was plaintiff's on-the-job training representative for one day during plaintiff's first two weeks. Plaintiff described this position as being his equal. Plaintiff testified that on that day, Noto mocked the way plaintiff spoke Spanish and made negative comments about Hispanics. Plaintiff claims he asked Noto to stop. *Id.* at 25.

On Friday, December 19, 1997, there was an altercation between plaintiff and a co-employee, Tina Albanese in the parking garage. On Monday, December 22, 1997, an employee, Phyllis Arthur, approached Robert Haibi, a supervisor who is Hispanic and Spanish-speaking, and complained about the December 19, 1997 incident, saying she was concerned for the safety of the female employees. Haibi telephoned Dowd, who was out of the office. Over the telephone, Dowd instructed Haibi to inter-

---

**1.** At his deposition, plaintiff stated that he "was told specifically that Mr. John Noto had full authority to take all personnel action within the office with regard to the employee that was under him." Citroner Depo. 89.

However, this hearsay statement by an unidentified declarant does not raise a genuine issue of material fact. Plaintiff admits that he never saw Noto discipline or terminate anyone and that Noto did not terminate him. *Id.*

view Albanese. At the interview, Albanese said that plaintiff confronted her in the parking lot after work and called her names such as "fucking cunt," "bitch," and "fucking asshole." Albanese said she was afraid plaintiff would assault her.

Haibi then interviewed three employees who witnessed the altercation. Dominick DeCicco, who was in the passenger seat of the automobile with plaintiff when the altercation took place, confirmed Albanese's claims orally to Haibi, and in a signed statement dated December 22, 1997, in which he states that plaintiff approached Albanese in the garage and "began screaming at Tina Albanese and used the following vulgar words: bitch, fuck, mother-fucker and cunt." Mike Lewis and Kevin Gayle, who witnessed the altercation as they were passing through the parking lot, also stated orally and in written statements dated December 22, 2002, that plaintiff used vulgar language with Albanese. After calling Dowd again, Haibi confronted plaintiff, who admitted that he "blew up" at Albanese and cursed at her, but claimed that it was none of defendant's business because the incident occurred after hours and off company property. Haibi told plaintiff not to return to work until the matter had been resolved. Haibi Aff. ¶¶ 4–9. In an e-mail dated December 23, 1997, Haibi summarized the statements he had obtained from Albanese, plaintiff, DeCicco, Lewis, and Gayle that plaintiff had confronted Albanese in the garage and used profanities.

At about this time, plaintiff telephoned Progressive's Human Resources Department in Ohio, and was transferred to Tom Schmitt, the Human Resources Director. According to Schmitt, this was the first time he ever had contact with plaintiff. Plaintiff testified that Tom Schmitt "was the personnel representative that I made my initial complaint about the actions of John Noto and Richard Dowd to during

the time that I resigned my position." Citroner Depo. 53. Plaintiff spoke with Schmitt on or after December 22, 1997 about three or four times. Plaintiff acknowledges that he spoke to Schmitt about his "situation" and a problem with back pay, but did not mention discrimination. Citroner Depo. 123. According to Schmitt, plaintiff complained that Noto berated and demeaned team members by saying such things as monkeys could do their jobs and denying them time for lunch. Schmitt Aff. ¶¶ 5, 10. As a result of his complaints, Schmitt resolved the back pay issue and commenced an investigation. Plaintiff attempted to resign to Schmitt, but, according to plaintiff, Schmitt would not accept his resignation until the investigation was complete. Citroner Depo. 90–91, 121–24.

At Schmitt's direction, an investigation was conducted into the circumstances relating to plaintiff's altercation with Albanese and plaintiff's allegations of an abusive work environment. Witness statements were taken from Haibi, Noto, Albanese, Gerard Louissant, Michael Lewis, Kevin Gayle, and Dominick DeCicco. According to Albanese, the following occurred: On December 19, Noto had spoken to plaintiff about using foul language. After the meeting, plaintiff said, "if I lose my job I'm going to kill these mother fuckers" and began asking other people if they had spoken to Noto. That night, as Albanese was leaving work and walking towards her car, plaintiff exited a vehicle of a co-employee, DeCicco, and approached Albanese in her automobile. Albanese lowered her window, and plaintiff said that he "heard that you hope that I get fired." Albanese exited her automobile and went over to DeCicco's automobile and said that she disliked plaintiff but that they could work together. Then, "in a fit of rage [plaintiff] came up to me. I thought he was going to strike me, but

he just began screaming at me and cursing at me, saying 'you fucking whore bitch, why don't you leave me alone, you cunt bitch.' " Albanese said she was ignoring plaintiff, and he began to shout more obscenities. She then walked away because she feared that plaintiff would strike her.

█ As part of the investigation, Dowd interviewed plaintiff on December 30, 1997. At his deposition, plaintiff testified that he does not remember the conversation, but it was recorded. Plaintiff reviewed the transcript and admitted that it is "an accurate record of what was said during that conversation." Citroner Depo. 94, 130–31, 148. While plaintiff testified that his memory of the events at the time of his deposition was not appreciably worse than his memory when he made the December 30, 1997 statements, he admits that "whatever has been transcribed from the recorded conversation I had with Mr. Dowd is correct to the best of my knowledge that I had then, at that time, which I imagine is better than the memory or knowledge that I have of the situation now." *Id.* 151, 61. He testified at his deposition that everything he told Dowd at the December 30, 1997 interview was true, except for omitting any mention of "any of the racism, the discrimination, the problems that I had with [Mr. Dowd] or Mr. Noto" because he feared losing his job. *Id.* at 150.[2]

In the recorded statement, plaintiff first discussed the December 19, 1997 incident. He stated that, as he and DeCicco were sitting in the car, Albanese came up to DeCicco's side of the car and started to have a conversation with him. He men-

tioned that he heard she said she hoped plaintiff got fired. After Albanese denied this, plaintiff exited the automobile. Eventually, Albanese "exploded" and admitted saying she hoped plaintiff got fired. Plaintiff admitted that they "were not speaking quietly." Plaintiff denied cursing at her, and denies using any vulgarities except he stated that he "might have called her a cow." Plaintiff stated that he called Albanese a cow because he wanted her to leave. Plaintiff said that he did not remember anything else because he was heavily medicated for asthma at the time of the incident. When confronted with statements by other employees that plaintiff had used vulgarities and cursed, plaintiff stated that he did not know why they would think that. He did not recall who was around, and he did not recall having a conversation with DeCicco after the event. Plaintiff's Statement 1–10, 33–34, Feliu Ex. 3.

In response to Dowd's question about why plaintiff had asked to resign, plaintiff stated that Noto:

had been laying really heavy against me for I don't know what reason. I was called Shmo boy on a regular basis, stupid, constantly repeating to me that a monkey could do my job.

The man insulted me for the quality of the work that I was doing but he wouldn't sit next to me to show me the way that he wanted it done. He would just constantly berate me.

I just couldn't come into work every day and just be told that I'm an idiot, and have no assistance in trying to do my job better.

\*　　\*　　\*　　\*　　\*　　\*

---

**2.** Plaintiff now argues that the transcript of the December 30, 1997 interview should be disregarded because it is hearsay and unauthenticated. In light of his sworn deposition testimony that everything in the recorded statement is true, this argument is frivolous.

Fed. R. Evidence 801(d)(2) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is the party's own statement in either an individual or a representative capacity."

.... He puts this doofus jar in the cube, everybody's got to pay a dollar to the doofus jar when they make a mistake because they're a doofus.

*Id.* at 10–11. Plaintiff's deposition testimony is inconsistent with his recorded statement on this point. While plaintiff stated to Dowd that the "doofus jar" was for all employees in his recorded statement, he testified at his deposition that "[a]s I recall right now, after the incident of a bottle being set up with the word doofus written on it being meant specifically for me, for me to put a dollar in every time I made a mistake." Citroner Depo. 92.

In his recorded statement, plaintiff also stated that Noto saw plaintiff having an asthma attack and berated him for not moving fast enough sometime after December 11. Albanese also was screaming at plaintiff at that point. Plaintiff also complained that Noto criticized his work and "insulted me for the quality of the work I was doing." Noto also berated plaintiff for taking recorded statements in Spanish. He said, "I'd be doing recorded statement in Spanish, then he would start making funny Spanish sounding noises in the middle of the recorded statement. That's just childish behavior that would drive me nuts." *Id.* at 13–16, 18, 53.

Plaintiff stated that he brought Noto's harassment to Noto's attention, but he did not respond. He stated that he also discussed the harassment with co-employees, who also felt that Noto insulted them by "the way he was telling us a monkey could do our job, that we were stupid, and he'd make really stupid physical threats." Noto also harassed all the employees by not permitting them to take breaks, even for lunch. *Id.* at 15. Plaintiff stated that he had not brought any of this to Dowd's attention because Dowd was on vacation by the time the situation became intolerable. However, when Dowd pointed out

that plaintiff had not mentioned any problem with Noto when Dowd and plaintiff met on December 11, 1997, to discuss what was bothering plaintiff, plaintiff explained that "I didn't want to get John in trouble. I thought this was something we could have handled just between the two of us." Further, when Dowd asked plaintiff why plaintiff had not contacted Dowd on his beeper the following week, when Dowd was out on vacation and plaintiff attempted to resign, plaintiff said that he "was under the impression I couldn't get in touch with you." Plaintiff concluded by saying that he did not have any other issues he wanted to discuss, and that his primary concern was his lack of job training. *Id.* at 12–13.

While plaintiff stated to Dowd on December 22, 1997, that he had not raised any problems regarding Noto with Dowd because he liked Noto, plaintiff testified that he had complained to Dowd twice about Noto's discrimination prior to the incident with Albanese. Plaintiff testified that both times Dowd asked him not to act so Hispanic and he should not be a "cocky spic." Plaintiff testified that both Noto and Dowd called him a "spic." Plaintiff claims that he did not include the use of this term in his EEOC charge or his complaint because he found it too vulgar. Defendant does not claim that anyone except Noto and Dowd discriminated against him. *Id.* at 29, 61, 64, 166–67–70.

### 2. *Defendant's Anti–Harassment Policy:*

Defendant has an "Open Door Policy," which is printed in the Employee Handbook and updated every year. The policy encourages employees to raise issues of concern with their supervisor, manager, a Human Resources representative, or anyone in management with whom they are comfortable. If employees cannot find anyone to whom they are comfortable complaining, the Open Door Policy encourages

them to contact the Chief Human Resources Officer, and provides a telephone number. The policy states "we are aware that at times fear of reprisal, real or perceived, may deter people from reporting behavior they believe . . . is not conducive to Progressive's work environment and Core Values." Therefore, defendant established a hotline, called "Alertline," that is operated by Pinkerton, an independent security firm, "as an additional channel of communication to report behavior inconsistent with our Core Values, such as employee harassment, fraud and other violations of our Code of Conduct. The Alertline may be involved anonymously and is available 24 hours a day." Schmitt Ex. A.

Defendant's Code of Conduct contains equal employment opportunity and harassment sections. The equal employment opportunity section states that "Progressive will not tolerate discrimination against any person because of . . . race . . . color . . . [or] natural origin." The harassment section provides that:

A. No Progressive person shall assault, threaten, abuse or harass another Progressive person . . . or commit an act of violence or engage in other harmful activity directed at any person.

B. . . . . Progressive expects each of us to respect the individual differences of our fellow employees and to be sensitive to our different backgrounds. Harassment or abuse of a person because of that person's race, national origin, [or] color . . . is prohibited and will result in appropriate discipline.

Schmitt Exhibit B. In the enforcement section, the Code of Conduct states that

[w]e expect that each person will exercise diligence in the detection of Code violations and in reporting any violation or suspected violation of this Code to his or her Human Resources Manager, General Manager, any member of the Policy Team, the Compliance Manager, the Chief Legal Officer or anonymously through our toll-free hot line (1–800–683–3604).

Progressive will seek to maintain the confidentiality of any such communication. No person who, in good faith, suspects and reports a violation of this Code will be subject to retaliation or discipline from the Company for making such a report.

It shall be a violation of the Code to intimidate or impose any form of retribution on any person who utilizes such reporting system for its intended purpose.

*Id.* Finally, the enforcement section provides that "Progressive will investigate promptly and thoroughly all reports of possible violations of the Code. Any Progressive person found to have engaged in proscribed conduct or activity will receive prompt and appropriate discipline, up to and including termination." *Id.*

Plaintiff acknowledged that he received the handbook twice, once when he was hired and again when he finished his training. Plaintiff testified that he did not know how Progressive applied its Code or how it handled breaches, but that he understood that he was "supposed to call Personnel with any complaints whatsoever about improper behavior on behalf of management." He also testified that "[w]e were always encouraged to let Progressive's management know, Progressive Human Resources know whenever the situation was not the best possible work environment for an employee." Plaintiff claims he did not complain about Dowd or Noto to anyone else because he was worried that he would lose his job; Dowd threatened employees that they would be terminated for complaining outside the "family" early during plaintiff's employ-

ment when one employee complained about two other employees fighting. At another point, plaintiff testified that he contacted defendant's telephonic help line to complain about the hostile work environment and the doofus jar, but he does not recall when he made this call, to whom he spoke, what he was told, or if he called anonymously. Citroner Depo. 29, 54, 61, 64, 68–70, 92–94, 118–19, 123, 127, 146, 166.

### 3. Plaintiff's Termination:

Plaintiff does not know who made the decision to terminate him. Schmitt claims that he decided that plaintiff's actions of December 19, 1997 violated defendant's Code of Conduct. He found the other witnesses' accounts of the altercation consistent, and plaintiff's account was less credible. Schmitt and Dowd recommended to Neil Lenane, the Regional Claims Manager and Dowd's manager, that plaintiff be terminated for violating the Code of Conduct, and Lenane adopted this recommendation. Noto played no role in plaintiff's termination, according to Schmitt. Schmitt Aff. ¶ 9. Plaintiff does not know if other employees were terminated under similar circumstances. Citroner Depo. 166. Plaintiff's termination was effective December 31, 1997.

### 4. DeCicco's Testimony:

Dominick DeCicco, who was terminated from Progressive after being caught on videotape vandalizing defendant's property, claims that Noto displayed animosity towards other ethnic groups as well. DeCicco claims that Noto, who is Italian–American, "occasionally" called DeCicco, who is also Italian–American, a "wop, grease ball." Another time, DeCicco claims that Noto told an employee to order him an egg roll and wonton soup after speaking to Asian–American insureds. On a third occasion, DeCicco claims that Noto said to him and a co-employee named Den-

nis, "[w]hat does a nigger know about Italian food" after Lewis, who is African–American, ordered an Italian dish for dinner. DeCicco also testified that Noto disagreed with Progressive's policy of hiring minorities. DeCicco Depo. 20, 29–30, 90–93, 129–30, 135.

DeCicco testified that Noto also harassed plaintiff. He claims in an affidavit that, while plaintiff was away in Florida, Noto told plaintiff's unit that he did not like plaintiff because he was Hispanic and that he disagreed with Progressive's policy of hiring minorities. DeCicco states that Noto instructed them to give plaintiff as much work as they could so he would quit or they would have a reason to fire plaintiff. DeCicco Aff. ¶ 10. DeCicco testified that Noto called plaintiff Speedy Gonzalez, made noises mimicking Spanish, and used "insulting words 'spick,' on occasion." DeCicco Depo. 124. However, at another point DeCicco testified that Noto referred to plaintiff as a "spic" at least once or twice a day, including when he left a Speedy Gonzalez doll on plaintiff's desk and said, "I put it on the desk as a companion for you. You guys will be at home with each other. You're both spics." DeCicco Depo. 126. On another occasion, DeCicco testified that Noto began dancing the "Mexican hat dance" while Noto was speaking Spanish on the phone. Dowd walked over, laughed, and walked away. Id. at 28. Finally, DeCicco testified that, one time when plaintiff had an asthma attack, DeCicco attempted to help him, but Noto yelled at him saying, "[l]et the spic choke." DeCicco Depo. 138.

DeCicco also claims that on December 23, 1997, Dowd and Noto called DeCicco into Dowd's office and told DeCicco they were going to terminate plaintiff and they wanted him to write and sign a statement, and make an audio recording, that they had prepared for him, which stated that

plaintiff had used profanity towards Albanese. DeCicco claims he told Dowd and Noto that that is not what happened in the parking lot and that he did not want to make false accusations, and they threatened to terminate DeCicco's employment if he did not sign the statement. At one point, DeCicco testified that Dowd was "present" for the meeting and left the building after the meeting, but at another point, DeCicco testified that Dowd was participating in the meeting over a speaker phone. DeCicco Depo. 70, 82; DeCicco Aff. ¶¶ 13–14.

According to DeCicco's deposition testimony, the events of December 19, 1997, occurred as follows. Albanese approached plaintiff. Plaintiff lowered his window, and Albanese began screaming at plaintiff and using profanities in incoherent sentences. Plaintiff responded by saying that he did not understand why Albanese was upset and that he had no issues with her. Plaintiff never left the car, never raised his voice, and never used profanity or threatening words.

## DISCUSSION

### Summary Judgment Standards

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the nonmoving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins.*

*Co.*, 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> In a discrimination action such as this, it is important to note that [a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence .... [W]here a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

### Plaintiff's Hostile Work Environment Claim:

██ The standards for a hostile work environment claim under Title VII, § 1981, NYSHRL and NYCHRL generally are the same. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000); *McCoy*, 131 F.Supp.2d at 370. In order to prevail on a hostile work environment claim, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.; Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A "hostile work environment claim will succeed only where the conduct at issue is so 'severe or pervasive' as to create an 'objectively hostile or abusive

work environment' and where the victim 'subjectively perceives the environment to be abusive.'" *Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999) (*quoting Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). "[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Whidbee,* 223 F.3d at 69 (*quoting Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)). However, the offensiveness of the individual actions is also a factor to be considered in determining whether such actions are pervasive. *Id.* at 69.

 To "withstand summary judgment a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* at 69. The Supreme Court has established a non-exhaustive list of factors relevant to the determination whether conduct is so severe or pervasive to support a hostile work environment claim. These include 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether the conduct was physically threatening or humiliating, or mere offensive utterance; 4) whether the conduct unreasonably interfered with plaintiff's work; and 5) what psychological harm, if any, resulted. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Richardson,* 180 F.3d at 437.

 According to plaintiff, Noto mocked the Spanish language; left a Speedy Gonzalez doll on plaintiff's desk and referred to plaintiff as Speedy Gonzalez; told plaintiff either once or several times (plaintiff's testimony is inconsistent) to act more white and loose his cocky Spanish attitude; and passed gas one time near his face and made a comment about Hispanics and beans. Plaintiff also states that Dowd told him to act more white on two occasions. Finally, plaintiff claims that Dowd referred

to him as a "spic" on one occasion, and that Noto used the same term on an unstated number of occasions, but he did not include this claim in his EEOC charge or civil complaint because he found the term too offensive. At one point, DeCicco claims that Noto referred to plaintiff as a "spic" occasionally, and at another point he says that Noto did so at least twice a day.

According to the complaint, Noto's racial harassment of plaintiff commenced on December 11, 1997, just seven to eight business days before he was suspended on the morning of December 22. In his deposition, plaintiff claims that the racial harassment commenced earlier. Defendant argues that this testimony should be disregarded because it is inconsistent with the complaint. Even considering this testimony, Noto harassed plaintiff for one day during training and for under a month between November 24, 1997, when Noto became Team Leader, and December 22, 1997, when plaintiff was suspended. Furthermore, plaintiff concedes at his deposition that any harassment before December 11, 1997, was "very low level." Under these circumstances, a reasonable jury could not conclude that there was one incident that was extraordinarily severe or that this "series of incidents was sufficiently continuous and concerted to have altered the conditions of [plaintiff's] working environment." *Whidbee,* 223 F.3d at 69.

DeCicco claims that Noto also made derogatory statements about other races or ethnic groups on three occasions. While racially derogatory comments learned second-hand are relevant, even if directed at other groups, there is no evidence that plaintiff ever was aware of these comments during his employment. *See Schwapp v. Avon,* 118 F.3d 106, 111–12 (2d Cir.1997). Nor was plaintiff aware of the other anti-Hispanic statements DeCicco alleges Noto

made about plaintiff. Plaintiff did not testify about these incidents, and he gave the following answer to the following question at the end of his deposition:

Q Are there any acts of discrimination that they committed that you haven't shared with us today so far?

A Not to my knowledge, sir.

Citroner Depo. 170.

 Moreover, even if Noto and Dowd harassed plaintiff, there is no basis for imputing this harassment to defendant. An employer:

is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden

under the second element of the defense.

*Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 In this case, defendant is entitled to rely on *Faragher* and *Ellerth* because, even though plaintiff was terminated, this termination was not the culmination of any harassment against plaintiff. "The *Faragher/Ellerth* defense is available to the employer despite the fact that the employee had been discharged, where the alleged hostile work environment did not culminate in employee's discharge, but the employee was instead fired for another reason." *Patterson v. CBS, Inc.,* 2000 WL 666337, * 8 (S.D.N.Y.2000) (holding that CBS could raise the *Faragher/Ellerth* defense because, even though the plaintiff was sexually harassed and terminated, the evidence showed that plaintiff was terminated for leaving his camera during a live broadcast). As discussed below, plaintiff was terminated because he sexually harassed a co-worker.

Defendant has shown that there is no issue of material fact as to the *Faragher/Ellerth* defense. Defendant exercised reasonable care to prevent and correct promptly any racially harassing behavior. It promulgated an antiharassment policy with a complaint procedure, the Code of Conduct and Open Door Policy, that provided an effective mechanism for employees to complain about harassment, confidentially if necessary. Further, plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. It is undisputed that plaintiff never complained to anyone about alleged racial harassment by Noto and Dowd prior to his suspension, despite the fact that the Code of Conduct

and Open Door Policy provided multiple channels for complaints and plaintiff knew how to use these channels, as evidenced by his complaints to Schmitt about Noto's non-discriminatory harassment.

A reasonable jury could not conclude that a fear of termination prevented plaintiff from complaining to other managers. First, plaintiff had no problem telling Schmitt about Noto's non-racial harassment on December 22, 1997, even though defendant claimed he was afraid that Dowd would terminate him if he went outside the "family" with complaints. Moreover, defendant established an anonymous hotline to protect employees who feared retaliation. Plaintiff claims that he called this hotline to complain about the doofus jar and the hostile work environment, but plaintiff does not testify that he complained about racial harassment. On the contrary, he testified that he never complained about Noto and Dowd to anyone besides Noto and Dowd. Further, plaintiff does not recall if he called the hotline before he was suspended.

**Plaintiff's Discriminatory and Retaliatory Termination Claims:**

 Retaliation and discrimination claims under Title VII and § 1981 are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426 (2d Cir.1999); *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 105 (2d Cir.2001); *McCoy v. City of New York,* 131 F.Supp.2d 363, 370 (E.D.N.Y.2001). In order to establish a prima facie case of retaliation, a plaintiff must show (1) participation in an activity, protected under anti-discrimination statutes, that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision.

*Richardson,* 180 F.3d at 426. A causal connection "may be established either *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (citation and quotation omitted) (emphasis in original).

 In order to establish a prima facie case of discrimination, a plaintiff must demonstrate that: (1) he belongs to a protected class; (2) he was qualified to perform the position's duties; (3) there was an adverse employment action; and (4) this employment action occurred under circumstances giving rise to an inference of discrimination. *See Stratton v. Dep't. For the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997). There is no rigid rule about what circumstances allow an inference of discrimination. However, such circumstances include remarks made by decision-makers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, or a pattern of recommending plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified. *See Chertkova v. Connecticut General Life Insurance Co.,* 92 F.3d 81, 91 (2d Cir.1996).

Once a prima facie case of discrimination or retaliation has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *Id.; Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell–Douglas Corp.,* 411 U.S. at

802–03, 93 S.Ct. 1817; *Johnson,* 931 F.2d at 207. If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *McDonnell–Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817. However, "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that the fact-finder may infer discrimination from the falsity of the employer's explanation). In the summary judgment context, *St. Mary's* requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services Ltd., Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994).

▪ Assuming that plaintiff (who is a member of a protected class, engaged in a protected activity by complaining to Dowd, and suffered an adverse employment action shortly after engaging in that protected activity) has met the minimal requirements of establishing a prima facie case of retaliation and discrimination, *St. Mary's Honor Ctr.,* 509 U.S. at 502, 113 S.Ct. 2742, he has not raised a genuine issue of material fact that defendant's articulated reason for his termination is a pretext for discrimination or retaliation. Defendant's articulated reason for terminating plaintiff is his sexual harassment of a co-worker. Defendant received consistent statements from the victim and three witnesses that plaintiff had harassed a co-worker and

found that plaintiff's recollection of the event was less credible.

Insofar as plaintiff attempts to rely on the substance of DeCicco's version of the altercation, as he now presents it in this litigation, it is so inconsistent with plaintiff's position as to what occurred with Albanese that it cannot be considered a reasonable basis for a jury to reject the sworn statement of the victim and other co-workers. Certainly, DeCicco's newly changed version of events cannot make the defendant's reliance on these statements, and DeCicco's own contemporaneous statements, pretextual.

Plaintiff also attempts to show pretext by relying on DeCicco's statements in this litigation that on December 23, 1997, Dowd and Noto met with DeCicco and told him that they wanted to fire plaintiff and that if DeCicco did not falsify evidence about the December 19, 1997 incident, they would fire DeCicco. However, drawing all reasonable inferences in favor of plaintiff, no reasonable jury could conclude the finding by defendant that plaintiff sexually harassed a co-employee on December 19, 1997 was a pretext for discrimination or retaliation. Haibi, who is Hispanic and who DeCicco asserts is fair and honest, states that, the day before DeCicco claims that Dowd and Noto forced him to falsify evidence in order to support their discriminatory termination of plaintiff, DeCicco told him that plaintiff accosted Albanese, cursed at her, and appeared to be about to hit her. According to Haibi, plaintiff also admitted to Haibi that he had cursed at Albanese on December 19, 1997. Neither plaintiff nor DeCicco deny making these statements to Haibi on December 22, 1997, and defendant submits an e-mail Haibi sent the following day, December 23, 1997, the same day that DeCicco claims he was pressured to falsify testimony, stating that DeCicco and plaintiff both admitted that

plaintiff used vulgar language to Albanese. Most importantly, DeCicco signed a statement on December 22, 1997, the day *before* he allegedly was pressured to fabricate evidence against plaintiff, stating that plaintiff used vulgar language with Albanese.

Under these circumstances, no reasonable jury could conclude that defendant's articulated reason for terminating plaintiff, namely his sexual harassment of a co-employee, was pretextual and that discrimination and/or retaliation were the true reasons for the termination.

## CONCLUSION

Defendant's motions for summary judgment is granted on all plaintiff's claims. The Clerk of Court is directed to enter judgment for defendant.

**SO ORDERED.**