Roselyn E. MARTIN, Plaintiff,

v.

**MTA BRIDGES & TUNNELS,**
Defendant.

No. 06 cv 3125 (CM).

United States District Court,
S.D. New York.

April 3, 2009.

Walker Green Harman, Jr., Law Office of Walker G. Harman, Jr., New York, NY, for Plaintiff.

John Griscom Epstein, MTA Bridges and Tunnels, New York, NY, for Defendant.

MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

Roselyn Martin ("Martin") brings this action against her employer the Triborough Bridge and Tunnel Authority ("TBTA")[1] alleging discrimination and re-

---

1. Identified by plaintiff incorrectly as "MTA Bridges & Tunnels," and reflected in the caption and on the docket under that name.

taliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). 42 U.S.C. §§ 2000e *et seq.*

Before this Court is defendant's motion for summary judgment dismissing plaintiffs claims for race discrimination and retaliation. For the reasons stated herein, the motion is granted.

### Background

Plaintiff Martin, a black female, commenced permanent employment with TBTA on or about July 17, 1989. (Epstein Decl. Ex. A, Compl. ¶ 7; Ex. C, employment ltr.; Ex. D, February 21, 2008 deposition of Roselyn Martin (hereinafter "Martin Dep.") at 6:13; Pls.' Rule 56.1 Counter–Stmt. ¶ 2.) TBTA is a public benefit corporation established pursuant to the New York Public Authorities Law ("PAL") and empowered to, *inter alia,* maintain and operate the seven toll bridges and two toll tunnels that connect the five boroughs of New York City. (September 8, 2008 Affidavit of Timothy W. Baker (hereinafter "Baker Aff.") ¶ 4.)

The TBTA Operations Department (or "Operations") is the largest department within TBTA. It provides traffic management, toll collection, maintenance, customer service, and security at TBTA facilities. (*Id.* ¶ 5.) The Chief of Staff Division in Operations (or "COS Division"), where plaintiff has been employed since 2000, is responsible for Operations planning, budgeting and performance measurement; the efficient scheduling of facility personnel; training incumbent personnel; formulating policies and procedures; monitoring compliance; and interagency and customer relations. (Baker Aff. ¶ 7.)

*Plaintiff's Educational Background and Employment History with TBTA*

Plaintiff was hired by TBTA as an "executive secretary" in or about July 1989. (Epstein Decl. Ex. C.) She began work at a starting salary of $30,000. (*Id.*) For the eight months prior to taking this permanent position, plaintiff had worked for TBTA as a temporary clerical employee. (Martin Dep. Tr. at 6:20–7:15.) At the time she was hired for permanent employment, plaintiff reported that she had a high school diploma and had graduated from secretarial school. (Epstein Decl. Ex. E, TBTA Personal History Questionnaire.) She had also completed five college credits at Lehman College. (*Id.*) Plaintiff subsequently took courses at John Jay College of Criminal Justice ("John Jay") while she was employed at TBTA. She has not obtained a diploma from that school. (Martin Dep. Tr. at 8:14–9:5.)

In late 1996, plaintiff submitted a resume to an internal TBTA job posting in which stated that she had received a B.S. from John Jay in Public Administration. (Epstein Decl. Ex. G.) At her deposition, plaintiff admitted that this information was false. (Martin Dep. Tr. at 17:17–18:4.) Plaintiff maintains that she did not intend to mislead TBTA, because she believed that she would obtain a college degree imminently. (Pls.' Rule 56.1 Counter–Stmt. ¶ 10.) Apparently, she has no such degree to this day.

In early 1997, TBTA promoted plaintiff to the position of "Maintenance Analyst" in the Maintenance Division of Operations. (Epstein Decl. Ex. F.) Her promotion came with a salary increase from $34,425 to $37,868. (*Id.*)

In October 2000, plaintiff was promoted again, this time to the position of Facility Budget Research Analyst in the COS Division. (Epstein Decl. Ex. H.) Her annual salary also increased 15% from $43,033 to $49,488. (*Id.*) Christian Meyer ("Meyer"), then TBTA Manager of Administration and Budget, interviewed plaintiff and recommended her for the "Facility Budget Research Analyst" position, and thereafter

became her immediate supervisor. (Martin Dep. Tr. at 20:23–25; July 25, 2008 Affidavit of Meyer (hereinafter "Meyer Aff.") ¶ 7.)

As part of a re-organization in the COS Division in late 2004, plaintiff's job was changed to "Budget and Safety Administrator" within the COS Division. (Epstein Decl. Ex. I.) Plaintiff's annual salary increased from $55,159 to $60,675. (Epstein Decl. Ex. I & Ex. J.) Plaintiff continues to work as Budget and Safety Administrator, and Meyer remains her immediate supervisor. (September 8, 2008 Affidavit of Timothy Baker (hereinafter, "Baker Aff.") ¶ 8, 11.)

Timothy Baker ("Baker"), who became Chief of Staff for Operations in December 2001, is Meyer's immediate superior. (Baker Aff. ¶ 10.)

TBTA managers evaluate exempt, non-represented (non-union) employees, such as plaintiff, using a Performance Appraisal Form (or "PAF"). (Baker Aff. ¶¶ 9, 28.) An employee who receives a "3" or "Satisfactory" rating on a PAF qualifies for any available across-the-board, cost-of-living salary increases (generally 3%) given by TBTA. (*Id.* ¶ 29.) A "4" or "Beyond Satisfactory" rating, or a "5" or "Extraordinary" rating, on a PAF qualifies the recipient for a merit pay increase, if there are sufficient funds in TBTA's budget. (*Id.*)

Since plaintiff joined the COS Division, Meyer evaluated has evaluated her performance. Any salary increases have been approved by Baker. (Epstein Decl. Ex. K. at 9.) Plaintiff received a 3% salary increase in January 2002, after her first full year in the Facility Budget Research Analyst position in the COS Division, based on an overall rating of "3" or "Satisfactory"

on her 2001 PAF. This brought her salary to $52,502. (Epstein Decl. Ex. K at 9; Baker Aff. ¶ 30.)

Plaintiff received the same rating the next year, but no across-the-board raises were given to any TBTA employees that year as a result of post–9/11 budget constraints. (Epstein Decl. Ex. L at 6; Baker Aff. ¶ 30.)

Plaintiff expressed dissatisfaction with her PAF rating in the years 2001 and 2002, and wrote a letter to Meyer in January 2003, explaining why she believed her rating should have been higher. (Epstein Decl. Ex. K & Ex. L.)

For her work in 2003 as a Facility Budget Analyst, plaintiff got an overall "4" or "Beyond Satisfactory" rating. She received a 3% salary increase, effective January 1, 2004, and also a 2% merit pay increase, effective April 4, 2004. This brought her salary to $55,159. (*Id.* Ex. M at 6; Baker Aff. ¶ 30.)

Plaintiff also received "Beyond Satisfactory" ratings for the years 2004 through 2007. Her 3% cost of living increases applicable to each of those four years, bringing her current salary to $68,290. (Epstein Decl. Ex. N, Ex. O, Ex. P & Ex. Q; Baker Aff. ¶¶ 32 and Ex. 1 annexed thereto.)[2]

In their affidavits submitted with defendant's moving papers, Baker and Meyer submit that plaintiff is a good worker and a valuable contributor to the work of the COS Division. (Baker Aff. ¶ 37; Meyer Aff. ¶ 26.)

*2004 Re-Organization of the COS Division*

After the April 2004 retirement of COS Division employee Jyoti Daftary ("Daf-

---

**2.** Thus, since joining the COS Division in October 2000, plaintiff's salary has risen from $43,033 to $68,290—58%. (Baker Aff. ¶ 32.) Since plaintiff's rating qualified her for a merit bonus, I infer that there for insufficient funds to pay merit bonuses, although the record is unclear.

tary"), who had been Manager of Operations Review Analysis and Initiatives, Executive Vice President Martha Walther ("Walther") and Baker initiated a review of staffing of the COS Division. (Baker Aff. ¶¶ 12, 13.) Frank Ronci ("Ronci"), TBTA Manager of Compensation and Benefits since 1998, conducted this review utilizing what is known as the "Hay System." (Baker Aff. ¶ 14.) The Hay System is a process that was developed in the 1950's to "evaluate management, professional and technical positions" within organizations. (July 22, 2008 Affidavit of Frank Ronci ("Ronci Aff.") ¶ 5.) The Hay System assigns a point rating to a job title by analyzing and giving weights to a particular job's duties, accountabilities, quantitative dimensions, and decision-making authority, as well as the knowledge and skills necessary to perform the job satisfactorily. (Ronci Aff. ¶¶ 6–7; Baker Aff. ¶ 15.) Based on the Hay evaluation of a job title (measured in points), it is assigned a salary range commensurate with its significance. (Ronci Aff. ¶¶ 7.) TBTA has used Hay to evaluate jobs and assign salary ranges since at least 1989. (Ronci Aff. ¶ 14.)

Ronci received formal training in 1999 in the use of the Hay System, and he has used Hay since then to evaluate all non-union jobs at the TBTA. (Ronci Aff. ¶¶ 3–6.)

As part of the 2004 re-evaluation of job titles and duties within the COS Division, each Department Head at TBTA completed a what is termed a "Managerial Position Questionnaire" ("MPQ") for certain non-union positions and submitted it to Ronci for review and analysis. (Ronci Aff. ¶ 11; Baker Aff. ¶ 16.) The MPQ is a form that identifies the essential duties of a particular job. (Id.) The incumbent in each position fills out the MPQ, identifying, together with his or her supervisor, the responsibilities of his or her current position. (Ronci Aff. ¶ 12; Baker Aff. ¶¶ 24, 25; Meyer Aff. ¶¶ 9–13.) That employee's supervisor and Department Head then approved the contents. (Id.)

Based on a job's responsibilities as set forth in a completed MPQ, Ronci assigned the job title a number of Hay Points and a salary range. (Ronci Aff. ¶ 7, 12.) Ronci calculated the mid-range salary using certain TBTA guidelines, but he did not participate in final salary determinations, which were made by TBTA management. (Id. ¶ 9.) According to Ronci, TBTA management, at its discretion, may recommend a salary above or below a mid-range based on the following factors: (a) how the rated employee's salary will compare to other employees at TBTA whose positions have equivalent Hay point ratings; (b) how the rated employee's salary will compare to his or her manager or subordinates (if any); (c) the history of Hay point increases for the position; and (d) the employee's performance history. (Id.)

Plaintiff contends that the Hay System is just one of many factors that TBTA uses to evaluate non-union employees. (December 4, 2008 Declaration of Roselyn Martin ("Martin Decl.") ¶ 7.)

*Plaintiff and the 2004 Re–Organization*

During the 2004 COS Division re-organization, Ronci evaluated plaintiff's job, which then had the title of "Facility Budget Research Analyst." Ronci compared the MPQ for plaintiff's position in 2004 to the one that had been prepared for the same position back in 1989. He concluded that responsibilities of the position had increased. (Ronci Aff. ¶ 14.) Accordingly, Ronci recommended raising the Hay points for plaintiff's position from 404 to 451. This also qualified the position for a higher salary range, calculated by Ronci as $54,852 to 82,277. (Id.) Ronci's evaluation was memorialized in a 2004 MPQ for plaintiff's position. In that MPQ the salary for

plaintiff's position was listed as $60,075. (Epstein Decl. Ex. I & Ex. J.) It is not clear from the record who determined that salary number.

On or about October 20, 2004, Meyer provided that MPQ to plaintiff. (Epstein Decl. Ex. V; W.) Plaintiff did not sign off on it. Instead, she completed an alternate MPQ form on October 25, 2004. On that form she changed her job title to "Manager, Safety and Budget" and listed duties that she felt had been omitted from the original form. (Epstein Decl. Ex. U; Martin Dep. Tr. at 31:6–32:16; Meyer Aff. ¶¶ 9, 10.)

On October 27, 2004, Meyer met with plaintiff. After reviewing her revised version of the MPQ, he integrated the description of additional job responsibilities recommended by plaintiff into the original draft MPQ. (Epstein Deck Ex. V; Meyer Aff. ¶ 11.) However, Meyer informed plaintiff that he would not change her job title to "Manager, Safety and Budget." (*Id.*)

Plaintiff refused to sign the revised MPQ. (*Id.*) Later on October 27, 2004, plaintiff e-mailed Meyer that she declined to sign the MPQ because, "My work responsibilities are vast and deserves [sic] the proper title and salary attached to it." (Epstein Deck Ex. V.)

According to defendant, Baker, Meyer's superior, did not approve Martin's suggestion that her job title be changed to "Manager, Safety and Budget," because she had no day-to-day responsibilities supervising employees within the COS Division; she reported directly to an intermediate manager, Meyer; and the majority of her responsibilities did not involve independent decision-making authority. (Baker Aff. ¶ 25; Meyer Aff. ¶ 6.) To Baker and Meyer, plaintiff was not a "Manager." (*Id.*)

Plaintiff counters that it is her responsibility to oversee the budgetary portion of each contract that is handled in the training division, and that she has to make independent decisions to make sure that sufficient funding is available. (Pl. Rule 56.1 Counter–Stmt. ¶ 60.) Plaintiff admitted at her deposition that other than signing time sheets when Meyer is unavailable, she has no permanent responsibility to supervise other employees. (Martin Dep. Tr. 168:3–12.)

On November 3, 2004, plaintiff wrote in an e-mail to Meyer that, "The title of 'Manager' was a mere suggestion." She advised that other titles, including "Administrator, Specialist, Coordinator, etc.," would be appropriate for her job. (Epstein Decl. Ex. V.) Plaintiff reiterated in her e-mail, however, that she felt that the scope of her responsibilities was not accurately reflected by the Hay points, or the increased salary assigned to her position. (*Id.*) [3]

Baker approved plaintiffs alternative suggestion that the title of her job be changed from "Analyst" to "Administrator" (Baker Aff. ¶ 25). He did not approve a salary increase above the salary range assigned to plaintiff's position by its Hay point score.

On November 3, plaintiff signed a new MPQ that listed her job as "Budget and Safety Administrator." (*Id.* Ex. W; Meyer Aff. ¶ 13.) However, in papers submitted in opposition to defendant's motion plaintiff denies that she "voluntarily" accepted the title of "Administrator." (Pl. Rule 56.1 Counter–Stmt. ¶ 61.)

According to the MPQ signed by plaintiff, the "accountabilities" for plaintiff's position in 2004 fell into five categories, and included the following duties with approxi-

---

**3.** The Hay System assigns points on the basis of job functions or duties-not job titles.

mate percentage of time for each category: (i) employee safety program development and performance reporting (30%); (ii) development and administration of the COS Division's operating budget for materials needed for its day-to-day operation (30%); (iii) reviewing purchase requisitions (15%); (iv) serving as liaison to TBTA's Health and Safety and Law Departments (15%); and (v) handling other special analytical projects for the COS Division (10%). (Epstein Decl. Ex. W; Meyer Aff. ¶ 14.) Plaintiff testified that the MPQ she signed incorporated all of the additional responsibilities she asked Meyer to add to the original draft. (Martin Dep. Tr. at 33:9–34:14.)

Plaintiff's salary increase took effect on November 3, 2004. Her new job title "Administrator, Safety and Budget," became effective in February 2005. (Epstein Decl. Ex. J.) There is no indication that plaintiff got a new job; rather she received a new and more impressive title for the expanded job that all agreed she was already doing (as reflected in the signed MPQ).

*Promotions of Other Employees in the COS Division*

Although plaintiff's job title was not upgraded to "Manager" during the 2004 reorganization, others in the COS Division were given either promotions or upgrades to managerial titles.

As part of the re-organization, Baker and Walther made the decision to downgrade and replace the position of Manager, Operations Review Analysis and Initiative, formerly occupied by Daftary and formerly rated at 677 Hay points. Instead, they created a new position—and assigned it fewer responsibilities than Daftary had. The new, downgraded job was and assigned 588 Hay points. (Baker Aff. ¶¶ 17, 18; Ronci Aff. ¶ 16.)

TBTA advertised this new position on its internal job posting system. According to the job posting for the position, its duties included managing, developing, preparing and publishing Operations policies, procedures and guidelines, and assuring TBTA-wide compliance. (Epstein Decl. Ex. S.) The minimum qualification requirements for the position were listed as (i) a baccalaureate degree from an accredited college or university in business, accounting, finance, marketing or engineering; (ii) supervisory experience with a minimum of ten years satisfactory full time experience in a transportation related industry; (iii) familiarization with the development and issue of policies and procedures, as well as internal controls and policy compliance. (*Id.*) Since plaintiff did not have a baccalaureate degree, she did not qualify for the job. And she did not apply for it. (Martin Dep. Tr. at 49:5–50:4.) Therefore, she was not denied the position.

At Baker's recommendation, the job was given to COS Division employee George Urstadt ("Urstadt"). (Baker Aff. ¶ 21.) Defendant submits that Urstadt has a Bachelor's degree in finance and approximately 20 years' experience writing policies and procedures, often in a management capacity, for transportation-related firms. (*Id.*) In addition, Urstadt had served as acting manager in the COS Division after Daftary's retirement. (*Id.*)

Meyer, plaintiff's direct supervisor, was promoted as part of the 2004 re-organization. Before, the re-organization, Meyer's job title was "Manager, Administration and Budget." (Meyer Aff. ¶ 3.) After Daftary retired, Meyer assumed additional managerial responsibilities, including supervising several employees and producing the Operations Department's monthly report which presents and analyzes comprehensive performance measurement indicators. (Baker Aff. ¶ 22; Meyer Aff. ¶ 4.) As part of the 2004 re-organization, Meyer

was promoted to "Director, Strategy, Budget and Performance," which was also assigned a Hay point rating of 588. (*Id.*) Meyer has a Master's Degree in Public Administration from Baruch College. (Meyer Aff. ¶ 3.) Meyer self-identifies as Hispanic, not Caucasian, as plaintiff claims. (*Id.*)

Theresa Torresi ("Torresi"), a college graduate who had been employed in the COS Division since 1981, and who previously held the position of "Scheduling Coordinator," was promoted to the position of "Manager, Staffing, Deployment and Support." (Baker Aff. ¶ 23; Def. Rule 56.1 Stmt. ¶ 54.) That position was given 534 Hay points. It required Torresi to directly supervise two employees and to assume management responsibilities for procurement of equipment and the scheduling of work and training for several hundred TBTA bridge and tunnel officers. (Baker Aff. ¶ 23; Ronci Aff. ¶ 16.)

Plaintiff believes her job involves more work and more responsibilities than the jobs occupied by Urstadt and Torresi. (Martin Dep. Tr. 60:4–62:17; 167:8–11.) Plaintiff does not understand why Torresi is a "Manager," and she is only an "Administrator." (Martin Decl. ¶ 8.) Plaintiff submits that she manages more work than Torresi, based on a period in 2003, when she covered for Torresi in her old job. (*Id.* at 60:4–19.) Because Torresi was out of the office, plaintiff handled the part of Torresi's job that involved verifying uniform vendors had supplied uniforms that met the scope of the TBTA contract. (*Id.* at 61:9–16; Pl. Rule 56.1 Counter–Stmt. ¶ 56.) Plaintiff could not quantify the number of hours she spent filling in for Torresi. (*Id.* at 62:9–17.)

Torresi was promoted again at the beginning of 2007, and Plaintiff applied for the position of "Manager, Staffing, Deployment and Support;" she did not get the job. It was given to Cassandra Gibbon, an African–American woman who had been working at the COS Division as an Operations Specialist. (Martin Dep. Tr. at 50:12–51:18; Ex. T.) Baker recommended Gibbon for promotion. (Baker Aff. ¶ 33.)

*Plaintiff's Complaint with the SDHR*

On November 1, 2004, plaintiff filed a charge with the New York State Division of Human Rights ("SDHR"). She alleged that TBTA was discriminating against her on the basis of her race and her participation in TBTA's Family Medical Leave Act (FMLA) program. (SDHR Charge ¶¶ 4, 5.)

Plaintiff alleged that she was denied a "promotion" when her job title was not changed to "Manager, Safety and Budget" during the 2004 MPQ process. (*Id.* ¶ 3) She alleged that race was a factor because three Caucasian employees in plaintiff's department (identified as Meyer, Urstadt and Torresi) were all promoted. Plaintiff also claimed that her use of FMLA leave was a factor in denying her the "promotion," *id.* ¶ 5, and that TBTA had retaliated against her. (*Id.*) Plaintiff claimed that TBTA's actions violated New York State Human Rights Law Section 296 and Title VII of the Civil Rights Act of 1964 ("Title VII").

Finding no probable cause to believe that TBTA engaged in any discrimination, the SDHR dismissed her claims on August 12, 2005. (Epstein Decl. Ex. Y.) On January 24, 2006, the Equal Employment Opportunity Commission (EEOC) adopted the findings of the SDHR, dismissed plaintiff's claim and issued her a right to sue letter for her Title VII claims. (Epstein Decl. Ex. Z.)

*Plaintiff Files the Instant Lawsuit*

Plaintiff filed her complaint in this Court, *pro se*, on April 24, 2006. She alleged that TBTA had violated Title VII

by denying her a promotion in October 2004 because of her race, her gender and her enrollment in TBTA's FMLA program. (Compl.¶ 8.) Plaintiff also alleged that, since filing her SDHR Charge in November 2004, she had experienced retaliation in the form of harassment, verbal abuse, and receiving extra work and additional responsibilities without an adequate increase in pay. (*Id.*) She specifically attributes these acts of retaliation to Meyer and Baker. (*Id.*)

At her deposition, plaintiff testified that the "verbal abuse" alleged in her Complaint referred to instances in which Baker, a supervisor, yelled at or raised his voice to her. (Martin Dep. Tr. at 76:15–21; 85:10–22.) Plaintiff testified that episodes with Baker were "on going," but the first specific instance she could recall occurred on January 12, 2006. (*Id.* at 77:3–11.) On that date, Baker asked plaintiff to come into his office to discuss plaintiff's "professionalism" and the importance of meeting deadlines. During the discussion Baker raised his voice. (*Id.* at 78:3–80:17.) Plaintiff wrote a letter, dated February 22, 2006, recounting her version of the January 12th meeting to Martha Walther, who at that time was acting president of TBTA and Vice President in charge of Operations. (*Id.* at 81:4–82:12.) In the letter, plaintiff said that Baker had yelled at her and made her feel like "a typical 'NEGRA WOMAN' in the presence of her 'MASTER'." (Epstein Decl. Ex. CC.) Plaintiff also wrote that Baker and Meyer "collaborate" to make sure that her work goes unnoticed, and undervalue her performance. (*Id.*) Plaintiff also expressed her opinion that Baker's treatment of "minority females is beyond reason." (*Id.*) Prior to writing that letter, plaintiff had never complained to anyone about Baker. (Martin Dep. Tr. at 85.23–86:2.) However, plaintiff testified that Baker did not use a racial term during that January 12, 2006 discus-

sion. (*Id.* at 83:23–84:9.) In fact, plaintiff could not recall any instance when Baker ever used a racial term when conversing with her. (*Id.* at 84:6–9.) Plaintiff testified that Baker never told her that he was upset because she filed the SDHR Charge. (*Id.* at 90:16–19.)

Plaintiff testified about a second incident that occurred in November 2007. Baker became angry at her because she had not properly set up a phone conference. He allegedly yelled at her during a meeting at which she and Meyer were both present. (*Id.* at 88:3–89:23.)

Plaintiff could not recount any other specific instance where Baker had yelled at her, nor could she quantify the number of other times she had been yelled at since she filed her SDHR Charge. (*Id.* at 86:19–87:22.)

Plaintiff could not identify any specific incident when Meyer, her direct supervisor, yelled at her or made a racially disparaging remark. (*Id.* at 92:10–93:20; 152:4–13.) Plaintiff testified, however, Meyer had unfairly assigned her extra work since she filed her SDHR Charge. (*Id.* at 95:13–17.) Specifically, plaintiff stated that, in August 2006, Meyer asked her to learn how to draft and prepare monthly performance reports for the Operations Department. Ordinarily that task was performed by Marlene Thompson, a co-worker in plaintiff's unit. Thompson was going on maternity leave for three months. (*Id.* at 95–13–100:23.) Aided by Meyer, as well as another TBTA employee, plaintiff prepared approximately three monthly performance reports, the last one being produced at the end of the first quarter of 2007. (*Id.*; Meyer Aff. ¶ 21; Pl. Rule 56.1 Counter–Stmt. ¶ 103.) Plaintiff spent approximately fifteen hours per month on this assignment. One of plaintiff's regular tasks was delegated to anoth-

er employee while she covered for Thompson. (*Id.*; Pl. Rule 56.1 Counter–Stmt. ¶ 108.) She was able to complete the rest of her usual assigned tasks at the same time. (Meyer Aff. ¶ 24; Def. Rule 56.1 Stmt. ¶ 108.)

Plaintiff asked Meyer to pay her extra money during the time she prepared the monthly performance reports. (Def. Rule 56.1 Stmt.¶ 105.) Meyer refused.

Plaintiff admits that it is "a matter of routine" in the COS division for employees, as part of their normal job responsibilities, to fill in for one another when co-workers are out sick or on vacation. (Meyer Aff. ¶ 22; Pl. Rule 56.1 Counter–Stmt. ¶ 104.) It is not TBTA policy to pay an employee additional money for temporarily covering for absent employees. (*Id.* ¶ 106.) If covering for another employee meant that plaintiff worked extra hours, however, plaintiff, like other COS employees, is entitled to compensatory time to be used as extra days off. (Def. Rule 56.1 Stmt. ¶ 110.) In the years 2004, 2005, 2006 and 2007, plaintiff worked 10, 12, 10 and 28 extra hours, respectively. (*Id.* ¶ 111.) The record does not indicate whether plaintiff took any compensatory time.

Plaintiff testified that she believes that defendant asked her to perform work outside of the scope of her delineated job responsibilities. In particular, plaintiff points out that, as Administrator of Safety and Budget, she (i) facilitates safety action and safety review meetings (also called case management panels); (ii) visits TBTA facilities to discuss safety programs; (iii) facilitates safety incentive award program; (iv) gathers information (including risk management data) for monthly safety reports and safety action plan binders; (v) updates summary sheets for binders; and (vi) puts together a Safety Newsletter for TBTA facilities promoting safety themes.

(Def. Rule 56.1 Stmt. ¶ 82; Martin Dep. Tr. at 120–128.) She contends that not all of these responsibilities are listed on her November 2004 MPQ form, and argues that some of these tasks were added in retaliation. Plaintiff admits, however, that, with the exception of circulating information to TBTA facilities promoting monthly safety themes, she was performing all of these tasks in 2004, and they were recognized as part of her expanded duties outlined in her November 3, 2004 MPQ. (Pl. Rule 56.1 Counter–Stmt. ¶¶ 83–87.)

*Dismissal of Some of Plaintiff's Claims*

On September 24, 2007, this Court adopted the August 31, 2007 Report and Recommendation of United States Magistrate Judge Ronald Ellis' as its opinion and dismissed plaintiff's disability discrimination and retaliation claims and her gender discrimination and retaliation claims under Federal Rule of Civil Procedure 12(b) (6). (Dkt. ## 15, 17.) The Court denied defendant's motion to dismiss plaintiff's Title VII race discrimination and retaliation claims. (*Id.*)

On September 26, 2007, two days after the decision issued and five days after the deadline for submitting objections to Judge Ellis' Report and Recommendation, the Court received a letter from plaintiff seeking an extension to file her objections. (Dkt. # 20.) Because plaintiff was at that time proceeding *pro se,* the Court vacated the order dismissing some of her claims and gave her until October 10, 2007 to file objections. (*Id.*) Plaintiff filed objections to the Report and Recommendation. (Dkt. # 22.) However, the Court was not persuaded by the objections, and the September 24, 2007 order was eventually reinstated. (*See, e.g.,* Dkt. # 43.)

In December 2007, plaintiff retained counsel. On May 23, 2008, plaintiff made

a motion, through counsel, for leave to amend her complaint to (i) assert claims of race discrimination under New York State and New York City Human Rights Law against TBTA, and Meyer and Baker,; (ii) add a claim for punitive damages; (iii) assert a claim for FMLA discrimination (which was really a claim for FMLA retaliation); and (iv) to add a hostile work environment claim. (Dkt. # 40.) By Memorandum Decision and Order dated July 17, 2008, 2008 WL 2796640, and amended July 23, 2008, I denied plaintiff's request as untimely and, in large measure, futile. (Dkt. ## 43, 45.)

Defendant now moves for summary judgment dismissing plaintiff's remaining Title VII claims of race discrimination and retaliation. For the reasons discussed below, that motion is granted.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c): *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

### II. Plaintiffs Race Discrimination Claim Under Title VII Is Dismissed For Failure To Make Out A *Prima Facie* Case

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ..." 42 U.S.C. § 2000e–2(a)(1).

Courts analyzing employment discrimination claims under Title VII apply the familiar three-step burden shifting approach first articulated in the United States Supreme Court case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668(1973). At the

outset, the plaintiff bears the initial burden proving, by the preponderance of the evidence, every element of a *prima facie* case of discrimination. *Id.*; *McMillan v. Examination Mgmt. Servs., Inc.*, No. 94 Civ. 2229, 1996 WL 551725 at *7 (S.D.N.Y. Sept. 27, 1996). If the plaintiff meets that minimal burden, defendant must come forward with a legitimate non-discriminatory reason for taking the action it took. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). At that point, the burden shifts back to the plaintiff to prove, with evidence, not conclusory supposition, that the defendant's articulated rationale is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. However, "a reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal citation omitted) (emphasis in original). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089 (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)).

**A. Plaintiff Has Not Met Her *Prima Facie* Burden To Withstand Summary Judgment On Her Claim that TBTA Unlawfully Failed To Upgrade Her Job Title To "Manager"**

■ To make out a *prima facie* case of discrimination, the plaintiff must introduce evidence that would, if credited, establish that: (1) she is a member of a protected class; (2) she is competent to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment decision or action;

and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on her membership in a protected class. *Feingold*, 366 F.3d at 152 (internal citations omitted); *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 767 (2d Cir.2002) (citing *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir.2001).)

There is no dispute that plaintiff meets the first two prongs of the *prima facie* case: (1) she is a member of a protected class and (2) she is competent to perform her job.

As to the third prong, Plaintiff characterized her claim in her SDHR Charge and in her Complaint as one for failure to promote—the failure of TBTA to give her the title of "Manager" being the adverse employment action she suffered. With the benefit of a full record, however, it is apparent that her claim is not actually one for failure to promote, because there was no promotion involved. Rather, plaintiff's contention is that, during a re-organization she did not receive a job tile commensurate with her job responsibilities and experience—"Manager"—while other people, not in her protected group, did.

Because plaintiff's burden at the *prima facie* stage is "minimal," *St. Mary's Honor Ctr., supra*, 509 U.S. at 506, 113 S.Ct. 2742, and because a context specific approach to discrimination cases is well accepted, *see, e.g., Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir.2004) (citing *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132 (7th Cir.1993)), the Court concludes, for purposes of this motion only, that defendant's failure to upgrade plaintiff's job title to "Manager" at the time her Hay points and salary increased satisfies the third prong of the *prima facie* test.

Defendant also argues that plaintiff has not met her burden on the fourth prong of the *prima facie* case, because she has not

shown that TBTA's failure to give her the title of "Manager" took place in circumstances giving rise to an inference of discrimination. (Def. Mem. at 19.) I agree.

Although courts in this Circuit have recognized that there "is no rigid rule about what circumstances allow an inference of discrimination," *Citroner v. Progressive Cas. Ins. Co.*, 208 F.Supp.2d 328, 342 (E.D.N.Y.2002), a plaintiff must do more than state that she is a member of a protected class who suffered an adverse employment action.

> The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, and, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees, or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified.

*Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996) (internal citations omitted). Since a court faced with a motion for summary judgment, does not resolve issues of fact, its determination of whether the circumstances give rise to an inference of discrimination must answer the following question; does the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive? *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir.1994) (internal quotations and alterations omitted). The summary judgment court does not itself decide whether such an inference should be drawn. *Id.*

On the record before the Court, plaintiff fails to raise any triable issue of fact on the issue of race discrimination. Defendant has submitted uncontroverted evidence that plaintiff's job title was not changed to "Manager" because of factors having nothing to do with race.

The uncontested facts of the case are that, in the fall of 2004, TBTA performed a division-wide re-organization, catalyzed by the retirement of a senior COS Division employee. In that re-organization, TBTA undertook a review of nearly every non-union position in the COS Division. This review was conducted using Hay System, which purported to use criteria to assess the relative value of job positions objectively, (*see, e.g.,* Ronci Aff. ¶¶ 6–9.)

During the review of the job plaintiff occupied, she asked that her title be changed to "Manager." Her request was denied because, in TBTA management's judgment, plaintiff had no day-to-day responsibility for supervising other COS Division employees and her duties did not involve independent decision-making authority. (Ronci Aff. ¶ 15; Baker Aff. 25; Meyer Aff. 6., Martin Dep. Tr. 168:3–12.) There is no evidence in the record that any Caucasian TBTA employees who held the title of "Manager" lacked such responsibilities. Torresi, Meyer and Urstadt, who are identified by plaintiff as comparables, all supervised other employees and occupied jobs identified by the Hay System as having "more complex tasks and higher knowledge levels" than plaintiff's position. (Ronci Aff. ¶ 16; Ronci Aff. Ex. 1 & Ex. 4.)

Plaintiff participated in creating, and signed off on, the final MPQ form for her position. She even suggested the title of "Administrator"—which was eventually accepted—as an alternative to her preferred proposed title of "Manager." (Epstein Decl. Ex. V.)

Plaintiff submits that the Hay System is not the only system used by TBTA to evaluate positions. (Pls. Rule 56.1 Counter–Stmt. ¶ 32.) However, she fails to offer evidence that other criteria were used by TBTA for that purpose.

Plaintiff's three alleged comparables—the three other COS Division employees who were given job titles of "Manager" or "Director" during the 2004 re-organization are also not comparable to her.

First, Meyer was promoted *out of* a manager position into an even higher (Director) position as part of the re-organization. His situation is entirely dissimilar from plaintiff's.

Second, the position occupied by Urstadt ("Manager, Policies, Procedures and Compliance") required a college degree—a qualification plaintiff lacks, and about which she lied to other employees. (Epstein Decl. Ex. S; Martin Dep. Tr. at 17:17–18:4.) Third, Urstadt's and Torresi's positions required them to manage and supervise other workers, which resulted in the assignment of additional Hay points. Plaintiff's job did not. (Ronci Aff. ¶¶ 15, 16; Ronci Aff. Ex. 1, Ex. 2, Ex. 3 & Ex. 4.)

Finally, plaintiff did apply for Torresi's Manager position after Torresi was promoted in 2007. Her application was denied, but not in circumstances suggesting discrimination—since she lost out to another Black woman. (Pl. Rule. 56.1 Counter–Stmt. ¶ 56.)

The uncontested evidence shows that Urstadt and Torresi were qualified for their positions. Urstadt has a Bachelor's degree in finance and approximately twenty years of directly relevant experience in writing policies and procedures. (Baker Aff. ¶ 21; Def. Rule 56.1 Stmt. ¶ 51.) Torresi had a college degree, twenty-three years of experience in TBTA's COS Division, with specific experience in scheduling

and corporate coordination when she assumed the management role in 2004. (Baker Aff. ¶ 23 Def. Rule 56.1 Stmt. ¶ 54.)

Plaintiff clearly believes that she was qualified for the title of "Manager" in 2004 and that her job responsibilities were greater than those of Urstadt or Torresi, but there is nothing in the evidence to suggest that racial discrimination was at play. A plaintiff's personal belief, or disagreement with corporate decisions, is insufficient to raise an inference of race discrimination. *See, e.g., Bucknell v. Refined Sugars, Inc.,* 82 F.Supp.2d 151, 157 (S.D.N.Y.2000): *Wado v. Xerox Corp.,* 991 F.Supp. 174, 188 (W.D.N.Y.1998). Moreover, the Court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Scaria v. Rubin,* 117 F.3d 652, 654–55 (2d Cir.1997) (*quoting Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)).

■ Neither is there any evidence of any racial animus in the COS Division or at TBTA—in the form of discriminatory remarks, actions or behavior—before, during or after the 2004 re-organization. In her declaration submitted in opposition to defendant's motion, plaintiff states, "It is my belief that Tim Baker is a racist...." (Martin Decl. ¶ 35.) But Plaintiff fails to present any evidence to support this bald assertion. A Title VII plaintiff must do more than make "unsupported assertions" and conclusory statements to meet her *prima facie* burden. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) "The [summary judgment] motion will not be defeated merely ... on the basis of conjecture or surmise." *Id.* (*quoting Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.)), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 412 (S.D.N.Y.2006).

Plaintiff cannot recall a single instance of Baker's ever making an invidious or

degrading comment—or any comment—about plaintiff's race. (Pl. Rule 56.1 Counter–Stmt. ¶¶ 95.) Baker approved numerous salary increases for plaintiff—including a merit based raise—during her tenure at TBTA. (*Id.* ¶ 117.) He also promoted a number of African American or Black Hispanic women within the COS division, including Cassandra Gibbon, who was assumed Torresi's managerial position in 2007. (*Id.* ¶ 115.) Another African American female employee, Karen Bowers ("Bowers"), was promoted to a managerial position on Baker's recommendation. (Def. Rule 56.1 Stmt. ¶ 115; Baker Aff. ¶ 33.) Plaintiff denies Baker recommended Bower's promotion (Pl. Rule 56.1 Counter–Stmt. ¶ 115), but fails to provide any evidence to back up her contention.

Plaintiff thus falls short of raising a genuine issue of material fact for trial. *See, e.g., Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. While the Court must consider the record in the light most favorable to the non-movant, the "non-movant may not rest upon the mere allegations or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Gnazzo v. G.D. Searle & Co.,* 973 F.2d 136, 138 (2d Cir.1992) (internal quotations omitted).

Defendant's motion for summary judgment on plaintiff's claim for unlawful race discrimination arising out of TBTA's failure to give her the title of "Manager" in 2004 is granted.

### B. Plaintiff Cannot Now Bring A New Claim for Unequal Pay

In opposing defendant's motion for summary judgment, plaintiff's claim for discriminatory failure to "promote" seems to have morphed into something new. She appears to have abandoned the theory of discrimination based on TBTA's failure to give her the title of "Manager" in favor of a claim that she was paid less than similarly situated Caucasian women at TBTA. (Pl. Opp'n at 1.) Plaintiff argues that the record "contains sufficient evidence" to support her *prima facie* case of "unequal pay for equal work under Title VII," citing the fact that she was allegedly paid less than two Caucasian female employees—Torresi and Maureen Day, a TBTA "Operations Specialist" who is mentioned for the first time in plaintiff's opposition papers. (*Id.* at 2–7.)

These new contentions—asserted for the first time in opposition to a motion for summary judgment, in blatant violation of the law in this Circuit[4]—does not save plaintiff's discrimination claim, because plaintiff failed to exhaust it administratively, as required by law.

A plaintiff in a Title VII action must allege all claims in her EEOC charge in order to exhaust her administrative remedies as to those claims. *Butts v. N.Y. Dep't of Hous. Pres. and Dev.,* 990 F.2d 1397, 1402 (2d Cir.1993), *superseded on other grounds by statute,* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1074 (collecting cases). A district court may only entertain claims that are either included in the EEOC charge or are based on conduct which is "reasonably related" to the allegations in the EEOC charge. *Id.* In general, a claim is "reasonably relat-

---

4. Since waiting until the last minute to assert a new claim "will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Beckman v. United States Postal Serv.,* 79 F.Supp.2d 394, 408 (S.D.N.Y.2000) (*citing Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 170 F.R.D. 111, 119 (S.D.N.Y.1997)); *see also Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996); *Bush,* 452 F.Supp.2d at 407.

ed" to those in the EEOC charge "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 1402 (quoting *Smith v. Am. President Lines, Ltd.,* 571 F.2d 102, 107 n. 10 (2d Cir.1978)); *see also Gaston v. N.Y. City Dep't of Health,* 432 F.Supp.2d 321, 328–29 (S.D.N.Y.2006). "In determining whether claims are reasonably related, the focus should be on the factual allegations made in the (EEOC) charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik,* 335 F.3d 195, 202 (2d Cir.2003).

Plaintiff did not assert a claim for race discrimination in her pay in her 2004 SDHR Charge (which became her EEOC Charge). (Epstein Decl. Ex. X; Ex. Z.) She alleged that TBTA failed to promote her to the position of "Manager, Safety and Budget" in 2004 in a racially discriminatory manner and that TBTA's retaliated against plaintiff for using FLMA leave. (SDHR Charge ¶¶ 3–5.) The claims in plaintiff's SDHR Charge were narrowly drawn. They included no reference to salary disparity for similar work. Therefore, plaintiff's equal pay claim is not "reasonably related" to the claims she asserted, and so has not been administratively exhausted. *Deravin,* 335 F.3d at 202; *Cf. In re WorldCom, Inc.,* No. 02 Civ. 13533, 2007 WL 1836599, at *4 (S.D.N.Y. June 26, 2007).

Neither is the equal pay claim evidence of a "continuing violation" of the conduct described in the SDHR Charge. *See, e.g., Owens v. Morgan Stanley & Co., Inc.,* No. 96 Civ. 9747, 1997 WL 793004, at *8 (S.D.N.Y. Dec. 24, 1997).

A claim that plaintiff was not paid commensurately with Caucasian female employees who had similar duties does not fall within the scope of the claims plaintiff

actually asserted and was not—and could not have been—investigated by SDHR. The SDHR Determination and Order After Investigation, which were adopted by the EEOC, makes no mention of such a theory and gives no indication that it was advanced by plaintiff. (Epstein Decl. Ex. Y; Ex. Z.)

As a consequence of plaintiff's failure to exhaust her administrative remedies on her newly-asserted Title VII claim of discrimination on the basis of unequal pay, the Court lacks jurisdiction over any such claim. *See, e.g., Owens,* 1997 WL 793004 at *8.

### III. Plaintiff's Claim for Retaliation is Also Dismissed

Defendant has also moved for summary judgment on plaintiff's claim that TBTA illegally retaliated against her for filing her SDHR Charge. (Def. Mem. at 24.)

Title VII prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing...." 42 U.S.C. § 2000e–3(a).

A plaintiff alleging that she suffered retaliation as a consequence of filing a discrimination charge is not administratively barred for failure to raise such a claim in a previous EEOC charge. Retaliation claims are considered "reasonably related" to the conduct alleged in an EEOC Charge. *Butts,* 990 F.2d at 1402. Accordingly, a plaintiff generally need not file a new charge with the EEOC in order to pursue her retaliation claim in federal court. *See, e.g., Shah v. N.Y. State Dept. of Civil Serv.,* 168 F.3d 610, 614 (2d Cir. 1999).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) she was engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 68–69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citations and quotations omitted); *Pugni v. Reader's Digest Ass'n, Inc.,* No. 05 Civ. 8026, 2007 WL 1087183 at *22 (S.D.N.Y. Apr. 9, 2007). If the plaintiff meets this burden, the *McDonnell Douglas* burden-shifting analysis applies. *Bush,* 452 F.Supp.2d at 415. (*citing Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003)).

Plaintiff engaged in a protected activity by filing her SDHR Charge, and TBTA knew of that activity. (Def. Mem. at 25.) Therefore, plaintiff meets the first two prongs of a *prima facie* case for retaliation.

As to the third prong, the Supreme Court recently clarified that the scope of the anti-retaliation provision, holding that it casts a wider net of protection than Title VII's substantive discrimination provision and "extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern,* 548 U.S. at 67, 126 S.Ct. 2405. In the *Burlington Northern* decision, the Court provided a framework in which to evaluate whether an action is a prohibited retaliation under Title VII. Specifically, a plaintiff must show that "a *reasonable* employee would have found the challenged action *materially* adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. 2405 (citations and quotations omitted) (emphasis added); *see also Kessler v.*

*Westchester Cty. Dep't of Soc. Servs.,* 461 F.3d 199, 209 (2d Cir.2006).

In her Complaint in this Court, plaintiff alleged that TBTA's retaliation against her for filing the SDHR Charge took the form of (i) inundating her with extra work and adding responsibilities to her job as described in the MPQ without providing her with additional compensation, and (ii) subjecting her to harassment and verbal abuse. (Compl. ¶ 8.)

Defendant contends that no materially adverse action was perpetrated against plaintiff. As to TBTA's allegedly inundating plaintiff with extra work and additional responsibilities, plaintiff testified at her deposition that she performed work she believed was outside the scope of job description. (Martin Dep. Tr. at 120:5–128:3.) However, defendant presents uncontested evidence, and *plaintiff specifically admits,* that, with the single exception of circulating information about monthly safety themes, all of the work plaintiff described as "additional" was actually performed by her as part of her job in 2004, and was listed among the job duties in her signed, November 3, 2004 MPQ. (Pl. Rule 56.1 Counter–Stmt. ¶¶ 82–87.) No reasonable employee would think being asked to perform tasks that are part of her job description constituted a materially adverse employment action. *See Burlington Northern,* 548 U.S. at 69, 126 S.Ct. 2405.

Plaintiff also testified at her deposition that, in the "last quarter" of 2006, she was asked by Meyer to cover for co-worker Marlene Thompson, who was on maternity leave. (Martin Dep. Tr. at 95:13–121:3.) Plaintiff acknowledges, however, that it is "a matter of routine" for TBTA employees to fill in for one another when someone is absent. (Pl. Rule 56.1 Counter–Stmt. ¶ 104.) Plaintiff also admits that she was given assistance with some of her regular

duties and was able to complete her usual work while helping to fill in for her co-worker. (*Id.* ¶ 108.) Plaintiff asked to be paid extra money while she filed in for Thompson. (Martin Dep. Tr. at 103:13–15.) Meyer refused because it was not TBTA policy to provide additional compensation to an employee filling in for a co-worker. (Meyer Aff. ¶ 23.)

Being asked to fill in for absent colleagues is the sort of normal aggravation that all employees experience from time to time in the work place. Absent other special circumstances, it alone does not constitute an adverse employment action. Plaintiff has presented no evidence to refute defendant's contention, *and even admitted,* that it is not TBTA's policy to pay employees extra money when they cover for one another. (Pl. Rule 56.1 Stmt. ¶¶ 105, 106.) "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *See Burlington Northern,* 548 U.S. at 68, 126 S.Ct. 2405.

Even if filling in for a pregnant co-worker qualified for an adverse employment action, there is absolutely no evidence of any causal connection between plaintiff's SDHR Charge and her being asked to do work that was not part of her regular responsibility. Plaintiff has presented no direct evidence to show that any retaliatory motive lay behind her work assignments. Nor can plaintiff indirectly establish causation through circumstantial evidence "showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996). While the Second Circuit has articulated no "bright line" rule of when an allegedly retaliatory action occurs too far in time from the exercise of a federal right to be considered causally connected, *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir.2001), it is well settled that there when "mere temporal proximity" is offered to demonstrate causation the protected activity and the adverse action must occur "very close" together. *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation omitted). Time periods greater than one year have are generally conclusive that a causal nexus has *not* been established. *See, e.g., Deravin v. Kerik,* No. 00 Civ. 7487, 2007 WL 1029895, at *11 (S.D.N.Y. Apr. 2, 2007); *Zenni v. Hard Rock Cafe Int'l, Inc. (N.Y.),* 903 F.Supp. 644, 656 (S.D.N.Y.1995). Time periods as short as three months have been found to be too long to give rise to an inference that the subsequent action was retaliatory. *Breeden,* 532 U.S. at 273–74, 121 S.Ct. 1508 (*citing Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997)): *see also Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990).

Plaintiff testified that she was asked to fill in for an absent colleague sometime in the "last quarter" of 2006. That is approximately two years after she filed her SDHR Charge in November 2004—too long to raise triable issue of fact on retaliation.

As to the alleged verbal abuse and harassment, plaintiff testified she experienced "on-going" episodes of COS Division supervisor Baker yelling at her. However plaintiff could only testify about two such episodes since the filing of her SDHR Charge in 2004—one on January 12, 2006 when Baker raised his voice to her during a meeting concerning plaintiff's professionalism and ability to meet deadlines and one sometime during November of 2007 when Baker became angry because plaintiff

failed to set up a phone conference. (Martin Dep. Tr. at 77:12–80:5; 85:2–90:5.) Two instances of a superior yelling at a subordinate in a three year period—particularly as described by plaintiff—do not constitute a materially adverse employment action.

Plaintiff testified that these incidents were not isolated events. However, she could not recall the details of any other incidents. Nor could she recall any specific incidents of verbal abuse by Meyer. (Martin Dep. Tr. at 93:18–20.)

■ "Title VII, we have said, does not set forth a general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 68, 126 S.Ct. 2405 (*quoting Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Courts must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (*quoting Faragher v. Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Title VII prohibits actions that are likely "to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington Northern*, 548 U.S. at 68, 126 S.Ct. 2405 (*quoting* 2 EEOC 1998 Manual § 8, p. 8–13).

Even assuming, *arguendo*, that the two episodes with Baker plaintiff testified to rise to the level of an adverse employment action, plaintiff still fails to make out a *prima facie* case, because the temporal relationship between plaintiff's filing and Baker's allegedly retaliatory actions are too attenuated to establish a causal connection. The incidents plaintiff described occurred on January 12, 2006 and in November 2007—fourteen months and three years, respectively, after plaintiff filed her SDHR charge in November 2004. This is too long to raise an inference that the incidents were causally related. *See, e.g., Breeden*, 532 U.S. at 273–74, 121 S.Ct. 1508; *Hollander*, 895 F.2d at 84–85.

I therefore find plaintiff fails to meet her *prima facie* burden on her claim of retaliation in the form of verbal abuse because the actions complained of are not material adverse, or, in the alternative, do not meet the threshold of temporal proximity.

Defendant's motion for summary judgment on plaintiff's claim for retaliation is granted.

## CONCLUSION

Defendant's motion for summary judgment on plaintiff's remaining claims is granted in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendant and to close the case.

This constitutes the decision and order of this Court.